# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**NOT FOR PUBLICATION**

| |
|---|
| THERESA CARINO, |
| Plaintiff, |
| v. |
| W. GRESHAM O'MALLEY, III, |
| Defendant. |

Civ. Action No. 05-5814 (KSH)

**OPINION**

**KATHARINE S. HAYDEN, U.S.D.J.**

This diversity action arises out of a long love affair, and may at first blush seem an exotic entry on the federal docket. However, the parties are litigating issues that sound in contract and tort, and require a careful analysis of New Jersey law in order to determine how its highest court would rule on a point that is crucial to the plaintiff's cause: does she have a cognizable claim for palimony when the parties never cohabited in the traditional sense?

The 17-year relationship between Theresa Carino and Gresham O'Malley began in September, 1988. When they began dating, Theresa was an 18-year-old college sophomore living in a dormitory and Gresham, then 55 and divorced, was a member of the board of directors of a financial brokerage firm headquartered in Philadelphia.

The relationship ended in 2004. Theresa seeks palimony in this lawsuit and damages for physical and emotional abuse that she alleges occurred throughout the relationship. The complaint

sets forth nine causes of action that sound in either contract or tort: (1) assault; (2) battery; (3) support and compensation of an unmarried companion; (4) breach of contract; (5) breach of implied contract; (6) intentional infliction of emotional distress; (7) negligent infliction of emotional distress; (8) unjust enrichment; and (9) promissory estoppel.

Gresham has filed for summary judgment on the contract claims on the basis that the parties never cohabited, arguing that under New Jersey law, most recently articulated by the Appellate Division on March 6, 2007, cohabitation is an absolute prerequisite to a claim for support arising out of a relationship akin to marriage between unmarried persons.  He seeks dismissal of the remaining tort-based claims on grounds that they are time-barred.

For the reasons set forth in this opinion, the Court denies the motion as to the contract based claims because it is not persuaded that the highest court of New Jersey would require a "bright-line requirement" precluding Theresa's claim for support from Gresham under the facts pleaded and supported in the record.  As more fully set forth below, such a finding would not comport with equitable principles that gave rise to judicial recognition of palimony as explained in cases decided by the New Jersey Supreme Court.  Nor would such a finding advance the justifications for a cohabitation requirement that have been expressed in recent Appellate Division opinions that do articulate a "bright-line requirement," upon which this motion rests.

The Court also denies the motion as to the tort claims because it finds that the New Jersey statute of limitations applies in this lawsuit, and therefore some of the incidents alleged are timely brought.  As to the others, which Theresa argues must survive as timely brought based on Battered

Woman's Syndrome, whether there was any abuse at all is hotly disputed and will require a determination on credibility. Thus whether acts of alleged abuse occurring outside the two-year limitations period are preserved cannot be decided on motion.

## I.    JURISDICTION

Theresa filed in the Chancery Division, Family Part, Morris County on October 11, 2005. Gresham removed the action to federal court on December 14, 2005 pursuant to 28 U.S.C. §§ 1441(a) and 1332, based on the diversity of citizenship of the parties. Although Theresa has not objected to removal, it is appropriate to determine whether her claims fit into the "domestic relations" exception to federal diversity jurisdiction, because as a statutory limitation on the Court's jurisdiction, if the exception applies the Court must dismiss *sua sponte*. Fed. R. Civ. P. 12(h)(3).

The domestic relations exception has its roots in Barber v. Barber, 21 How. 582 (1859), where the Supreme Court, in *dicta*, disclaimed jurisdiction over divorce and alimony decree suits. Over the years, the Court continued to recognize the exception but did not explain its basis until its decision in Ankenbrandt v. Richards, 504 U.S. 689 (1992). In Ankenbrandt, the Court held that while 28 U.S.C. § 1332 does not contain explicit language excluding domestic relations matters from federal diversity jurisdiction, Congress's failure to alter the exception after more than 130 years demonstrated that "Congress 'adopted that interpretation' when it reenacted the diversity statute." Id. at 701 (quoting Lorillard v. Pons, 434 U.S. 575, 580 (1978)).

The Ankenbrandt Court emphasized that the domestic relations exception covers only "a narrow range of domestic relations issues." 504 U.S. at 701. The Court specifically held that federal

courts have jurisdiction to entertain complaints alleging the commission of torts during domestic

disputes and declared that the exception only prohibits federal courts from exercising jurisdiction

over cases seeking "divorce, alimony, and child custody decrees." Id. at 703-04.

> Not only is our conclusion rooted in respect for this long-held understanding, it is also supported by sound policy considerations. Issuance of decrees of this type not infrequently involves retention of jurisdiction by the court and deployment of social workers to monitor compliance. As a matter of judicial economy, state courts are more eminently suited to work of this type than are federal courts, which lack the close association with state and local government organizations dedicated to handling issues that arise out of conflicts over divorce, alimony, and child custody decrees. Moreover, as a matter of judicial expertise, it makes far more sense to retain the rule that federal courts lack power to issue these types of decrees because of the special proficiency developed by state tribunals over the past century and a half in handling issues that arise in the granting of such decrees.

Id.

The Supreme Court did not include palimony, which had been established by 1992, within

the "narrow range of domestic relations issues" falling within the exception. Id. at 701. Nor do the

policy reasons underlying the exception support its inclusion. Alimony is typically paid out over a

period of years and can be modified by the court if the parties' circumstances change, whereas a

plaintiff who prevails in a palimony case is "entitled to a one-time lump sum judgment in an amount

predicated upon the present value of the reasonable future support defendant promised to provide."

Kozlowski v. Kozlowski, 80 N.J. 378, 388 (1979). Moreover, while family court judges certainly

have a "special proficiency" for cases involving intimate relationships, a palimony claim arises out

of a *contract* between the parties as opposed to their relationship.

Relying on Ankenbrandt, the First Circuit has ruled that federal courts have jurisdiction to

hear palimony suits because "lawsuits affecting domestic relations, however substantially, are not

within the exception unless the claim at issue is one to obtain, alter or end a divorce, alimony or child

custody decree." <u>Norton v. McOsker</u>, 407 F.3d 501, 505 (1st Cir. 2005).  That decision recognized that plaintiff Gail Norton's claims rose out of "the dissolution of an intimate relationship," but noted that even if her claims could be heard in state family court, the district court was not required to abstain and remand, because "Norton's claims do not sound in family law, let alone the specific areas of divorce, alimony, and child custody.  Instead, Norton brought tort and contract claims." <u>Id</u>.  Based on <u>Ankenbrandt</u> and the First Circuit's reasoning in <u>Norton</u>, this Court is satisfied that it properly exercises jurisdiction over the issues presented here.

## II.    STANDARD

Fed. R. Civ. P. 56(c) authorizes a court to grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  "In so deciding, a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." <u>Gray v. York Newspapers, Inc.</u>, 957 F.2d 1070, 1080 (3d Cir. 1992).  The role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).  The non-moving party "may not rest upon the mere allegations or denials of the . . . pleading"; plaintiff's opposition, "by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).

In a diversity case, the court must apply the choice of law rules of the forum state to determine the governing law.  <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496 (1941).  In construing state law, the court "must determine how the highest court of the State would decide an

issue." <u>Commissioner of Internal Revenue v. Estate of Bosch</u>, 387 U.S. 456, 464-65 (1967).  The Supreme Court has declared that "while the decrees of 'lower state courts' should be 'attributed some weight . . . the decision [is] not controlling . . .' where the highest court of the State has not spoken on the point." <u>Id.</u> at 465 (quoting <u>King v. Order of Travelers</u>, 333 U.S. 153 (1948)).  But in <u>West v. A.T.&T. Co.</u>, 311 U.S. 223, 237 (1940), the Court warned that "an intermediate appellate state court . . . is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise."  "In predicting how the highest court of the state would resolve the issue, [the Court] must consider 'relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand.'" <u>Nationwide Mut. Ins. Co. v. Buffetta</u>, 230 F.3d 634, 637 (3d Cir.2000) (quoting <u>McKenna v. Ortho Pharm. Corp.</u>, 622 F.2d 657, 663 (3d Cir. 1980)).

## III.    FACTUAL BACKGROUND

The following factual background is established from the record, consisting of the complaint, the answer, answers to interrogatories, attorney certifications, and depositions.

Theresa and Gresham began their relationship in September 1988.  (Def.'s Stmt. of Undisputed Mat. Facts, docket entry # 29, at ¶ 3.)  At the time they became romantically involved, Theresa was an 18-year-old sophomore at the University of Pennsylvania and Gresham was a 55-year-old divorced father of three, the youngest of whom was in high school.  (Id. at ¶¶ 3-5; Gresham O'Malley Dep. at 22:25-24:11; Inez O'Malley Dep at 10:22-24, 12:21-24.)  Gresham, who has since retired, was then a senior executive and member of the board of directors at Janney Montgomery Scott ("JMS"), a Philadelphia-based financial brokerage firm.  (Gresham O'Malley Dep. at 38:7-20.)

The parties met at a dinner event sponsored by JMS where Theresa's father worked as a broker. (Pl.'s Stmt. of Undisputed Mat. Facts, docket entry #41, at ¶ 6.)  She was a last minute substitute for her mother, who had fallen ill.  (Id.)  Gresham pursued Theresa from the moment they met; it appears their intimate relationship began within the next weeks.  (Id. at ¶ 5; Gresham O'Malley Dep. at 45:14-16.)

Their relationship was exclusive on Theresa's part over the next 17 years.  Gresham claims to have "dated" other women periodically between 1988 and 2005, but he named only two and it does not appear from the record that he formed intimate relationships with them.  (Gresham O'Malley Dep. at 51:8-53:12, 279:2-6.)  Albeit the issue of cohabitation loomed large at oral argument and in the parties' submissions, the evidence does not establish that the parties ever maintained a joint residence.  Gresham never moved out of his mansion on an estate in Villanova, Pennsylvania, where he has lived for the past 40 years (Gresham O'Malley Dep. at 21:8-23:17), and Theresa never specifically moved in.  When they began their relationship and for the rest of her sophomore and junior years, Theresa lived in a dormitory on campus.  (Theresa Carino Dep. at 11:19-12:6.)  Then for her senior year she lived in an off-campus apartment in Philadelphia.  (Id. at 12:11-25.)  During those college years, Theresa would spend one or two week nights and most weekends at Gresham's home (Theresa Carino Dep. at 49:3-6), but she never spent a night at his house when he was not there (id. at 51:2-4).  She kept some clothes and toiletries at Gresham's house, but most of her clothing remained in her dorm room or apartment.  (Id. at 52:18-55:17.)  Theresa lived primarily with her parents in New Jersey each summer between school years, but she also spent time with Gresham on summer weekends and on vacations they took together.  (Id. at 13:11-24.)

Theresa's first job after she graduated from the University of Pennsylvania in 1991 was with AT&T in New Jersey and later New York City. (Theresa Carino Dep. at 24:23-25:6.) For her first five years out of college, Theresa lived in an apartment in Mendham, New Jersey. (Id. at 10:12-23.) In 1996, when AT&T transferred her to its New York City office, Theresa moved to an apartment on First Avenue in Manhattan to be closer to her job (id. at 10:5-11) and, she claims, because Gresham "urged [her] to relocate from New Jersey to Manhattan on the basis that it would be more convenient for their relationship." (Compl. at ¶ 18(a).) Gresham guaranteed the lease on the First Avenue apartment and provided her with financial assistance to pay rent. (Gresham O'Malley Moving Br. at 2.) Then in 2001, Gresham helped Theresa purchase a condominium on East 30th Street in Manhattan and eventually paid off the entire mortgage. (Gresham O'Malley Dep. at 187:15-188:11.) She continues to live there today. She has not been employed since March 2002. (Theresa Carino Dep. at 9:23-10:4, 17:17-20.)

Theresa claims that even though she was living and working in New Jersey and New York, she continued to spend a great deal of her free time with Gresham. (Theresa Carino Ans. to Inters., Cert. of David Osterman, Ex. 4, at 18.) Aside from time they spent together in Villanova, Mendham, and Manhattan, the couple also went to spas and resorts in the United States, and traveled abroad, sometimes for weeks at a time, to Spain, France, Denmark, Finland, Sweden, Norway, Italy, England, Bermuda, Anguilla, St. Croix, St. Maarten, Jamaica, Ecuador, Grenada, the Galapagos Islands, South Africa, Zimbabwe, Alaska, Australia, and New Zealand. (Id. at 13-18.) Gresham's deposition testimony does not directly dispute that the parties spent many nights with each other over the years or that they went on long vacations together, but he said that he could not recall how many nights they were normally together each year. When plaintiff's counsel tried to elicit from Gresham

an estimate, year by year, of how many nights he typically spent away from his Villanova mansion, he could not recall whether it was more than 20 or fewer than 350 for any of the years in question, beginning in 1988 and ending in 2004.  (Gresham O'Malley Dep. at 26:13-36:20.)

It is not disputed that Gresham provided significant financial support to Theresa in the course of their relationship.  Aside from the $345,000 Manhattan condominium that he purchased for her, Gresham gave her large amounts of cash and regularly paid her credit card, health insurance, and utility bills.  (Gresham O'Malley Dep. at 173:25-174:10, 189:9-199:22.)  Gresham also paid for a trip that Theresa took by herself to Antarctica and for a cruise for Theresa and her mother on the Queen Elizabeth II ocean liner.  (Theresa Carino Ans. to Inters., Cert. of David Osterman, Ex. 4, at 18; Gresham O'Malley Dep. at 137:9-11.)

Theresa claims that Gresham  promised on numerous occasions, both directly to her and also to her parents, that he would make provisions for her so that she could continue her lifestyle should he no longer be around to support her.  There is support in the record for her allegations of future financial support.  In a letter dated November 15, 1992, Gresham promised to give Theresa $15,000 to help in her plan to attend graduate school.  (Letter Dated Nov. 25, 1992, Cert. of David Osterman, Ex. 30.)  Theresa has also produced a codicil to Gresham's will that he signed on May 22, 1997 and revoked at some point thereafter, which would have given Theresa $48,635 for educational expenses upon his death.  (Codicil dated May 22, 1997, Decl. of Theresa Carino, Ex. B.)  In a letter written in 2004, Gresham promised to pay Theresa's monthly mortgage payments.  (Letter dated Jan. 16, 2004, Cert. of David Osterman, Ex. 34.)  He repeated promises of financial support to calm the fears of her parents about her future.  (Joseph Carino Dep. at 128:2-10.)  In short, in addition to Theresa's

allegations in the complaint, sworn answers to interrogatories, and deposition testimony, record evidence exists to establish that along with the actual payments and purchases, Gresham made financial promises to Theresa.

On the subject of her tort-based claims, Theresa has alleged that Gresham assaulted her on more than 100 occasions during the course of their relationship; her answers to interrogatories list 19 specific instances of physically violent acts.  (Theresa Carino's Ans. to Amended Inter., Cert. of David Osterman, Ex. 5.)  The alleged assaults all occurred in the period between "the early 1990s" and October 2004.  (Id.)

Theresa can recall only one instance, during a trip to Alaska and California, where she sought medical treatment because of what Gresham was allegedly doing to her.  (Theresa Carino Dep. at 151:18-23.)  However, it appears that the police were called on at least three separate occasions.  (Id. at 160:6-14.)  One such occasion was in October 2004 while the parties were staying at a hotel near Cherry Hill, New Jersey.  Theresa stated that they had been asked to leave a hotel in Camden County, New Jersey and that while they were driving to another hotel, Gresham repeatedly hit her.  The fight continued when they arrived at the Cherry Hill hotel.  From her deposition testimony:

| | |
|---|---|
| Theresa: | There were verbal arguments by this time there had been quite a bit of bruising and a lot of damage to my body.  And I think the hotel manager is the one who called the police because of noise. . . . |
| . . . . | |
| Question: | And it involved Mr. O'Malley head butting you and causing a bloody nose? |
| Theresa: | Yes, that wasn't the beginning of the argument.  That was the first violent act that took place. |
| . . . . | |
| Question: | So they asked you if you had been hit? |
| Theresa: | Yes, they did. |
| Question: | And what did you say? |
| Theresa: | No. |
| . . . . | |

-10-

| | |
|---|---|
| Question: | Out of fear for causing trouble for Mr. O'Malley? |
| Theresa: | Yes.  I think he would have been arrested if I had said he had just hit me in the condition that I looked.  And I think he knows that he would have been arrested too. |

(Theresa Carino Dep. at 186:10-195:15.)  Her deposition testimony also describes other incidents where she claims that Gresham physically assaulted her but the police were not called.  The alleged assaults occurred primarily in New Jersey, New York, and Pennsylvania, but some occurred in other states and foreign countries.

Gresham strenuously denies ever assaulting Theresa, "with the exception of one verbal argument in which he admits he pulled Plaintiff's scarf in anger after she made some inappropriate comments about his daughter."  (Gresham O'Malley Moving Br. at 7.)

Gresham's motion for summary judgment seeks the dismissal of the entire complaint.  He argues that the contract based claims, specifically counts 3, 4, 5, 8, and 9 of the complaint, must be dismissed because the parties never cohabited and New Jersey law makes cohabitation an absolute prerequisite to a claim for support arising out of a relationship akin to marriage between unmarried persons.  Gresham argues that the intentional tort claims, counts 1, 2, and 6 of the complaint, must be dismissed because they are barred by the applicable statutes of limitations.  Finally, Gresham argues that the claim for negligent infliction of emotional distress, count 7 of the complaint, must be dismissed because it is time barred, not supported by medical evidence, and is based on intentional torts, and is therefore subsumed under the intentional tort claims.

## IV.    CHOICE OF LAW

Theresa currently resides in New York and Gresham currently resides in Pennsylvania, but Theresa filed her complaint in the Superior Court of New Jersey and Gresham removed to the District of New Jersey.  Further confounding the situation, the conduct complained of occurred in

multiple states over a 17-year period.  Because several states appear to have some interest in having their law applied in this litigation, the Court must determine which state's law governs each of the different claims.

A federal court exercising diversity jurisdiction must apply the choice of law rules of the forum state and so New Jersey's choice of law rules must be applied to determine the governing law in this case.  <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496 (1941); <u>Echols v. Pelullo</u>, 377 F.3d 272, 275 (3d Cir. 2004).  New Jersey employs a two-prong "governmental interest" standard, "which requires application of the law of the state with the greatest interest in resolving the particular issue that is raised in the underlying litigation."  <u>Gantes v. Kason Corp.</u>, 145 N.J. 478, 485 (1996).  The first prong is to determine if a conflict exists between the laws of the respective states.  <u>Id.</u>  "Any such conflict is to be determined on an issue-by-issue basis."  <u>Veazey v. Doremus</u>, 103 N.J. 244, 248 (1986).  If no conflict exists, "the inquiry is over and, because New Jersey would apply its own law in such a case, a federal court sitting in diversity must do the same."  <u>Lebegern v. Forman</u>, 471 F.3d 424, 428 (3d Cir. 2006).  If an actual conflict does exist, then the Court must move to the second prong, which is to determine the state with the greatest interest in resolving the specific issue in dispute.  <u>Gantes</u>, 145 N.J. at 185.  "That analysis requires the court 'to identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties.'"  <u>Id.</u> (quoting <u>Veazey</u>, 103 N.J. at 248).

For the reasons explained below, the Court finds that New Jersey law governs each of Theresa's claims.

## A.  Contract Claims

The parties agree that there is no actual conflict between New Jersey, New York, and Pennsylvania on the contract issues in this case.  Each of those states enforces lifetime support agreements of non-married couples, and cohabitation is a factor that each state considers in its analysis.  Kozlowski v. Kozlowski, 80 N.J. 378 (1979); Morone v. Morone, 50 N.Y.2d 481 (1980); Knauer v. Knauer, 470 A.2d 553 (Pa. Super. Ct. 1983).  Because there is no conflict of laws on this issue, New Jersey law controls.  Lebegern, 471 F.3d at 428.

## B.  Intentional Tort Claims

An actual conflict exists between New Jersey, New York, and Pennsylvania on the intentional tort claims in this case.  New Jersey and Pennsylvania have a two-year statute of limitations period for intentional torts, N.J.S.A. § 2A:14-2(a); 42 Pa. Con. Stat. § 5524(1), while in New York the limitations period is one year, N.Y. C.P.L.R. 215(3).  Moreover, the states have different rules regarding the effect of Battered Woman's Syndrome ("BWS") on the applicable statute of limitations.  Two New Jersey courts have held that proof of BWS can affect the statute of limitations in civil cases.  Giovine v. Giovine, 284 N.J. Super. 3, 18 (App. Div. 1995) (holding that the statute of limitations should be tolled where plaintiff establishes by medical, psychiatric, or psychological evidence, that she suffers from BWS), overruled on other grounds, Brennan v. Orban, 145 N.J. 282 (1996); Cusseaux v. Pickett, 279 N.J. Super. 335, 344-45 (Law Div. 1994) (holding that BWS must be treated the same as a continuing tort because it "is the result of a continuing pattern of abuse and violent behavior that causes continuing damage").  On the other hand, neither New York nor Pennsylvania has a reported decision or statute that recognize BWS as a valid reason to toll the applicable statute of limitations, but both states do permit criminal defendants to admit evidence

-13-

of BWS in criminal cases to explain their allegedly criminal conduct.  <u>People v. Suarez</u>, 6 N.Y.3d

202 (2005); <u>Commonwealth v. Stonehouse</u>, 555 A.2d 772 (Pa. 1989).  Because there is an actual

conflict of laws, the Court must determine which state has the greatest governmental interest in

having its statute of limitations applied in the present case.

     The public policy considerations underlying New York and Pennsylvania's statutes of

limitations are straightforward: "(1) preservation of evidence; (2) the right of potential defendants

to repose; and (3) administrative efficiency and convenience."  <u>Kingston Coal Co. v. Felton Mining

Co., Inc.</u>, 690 A.2d 284, 288 (Pa. Super. Ct. 1997).  In <u>Flanagan v. Mount Eden General Hospital</u>,

the Court of Appeals of New York observed:

> The Statute of Limitations was enacted to afford protection to defendants against
> defending stale claims after a reasonable period of time had elapsed during which a
> person of ordinary diligence would bring an action.  The statutes embody an
> important policy of giving repose to human affairs.  The primary consideration
> underlying such legislation is undoubtedly one of fairness to the defendant.  There
> comes a time when he ought to be secure in his reasonable expectation that the slate
> has been wiped clean of ancient obligations, and he ought not to be called on to resist
> a claim where the evidence has been lost, memories have faded, and witnesses have
> disappeared.

24 N.Y.2d 427, 429 (1969) (internal citations and quotations omitted).  These are the familiar policy

reasons underlying all statutes of limitations and New Jersey recognizes them.  <u>Galligan v. Westfield

Ctr. Serv., Inc.</u>, 82 N.J. 188, 191-92 (1980).  But New Jersey has express concerns in cases involving

domestic violence, with the consequence that the limitations period may, under some circumstances,

give way to them.

     As noted above, evidence of BWS may serve to toll the statute of limitations in certain civil

actions.  The Appellate Division cited the "clear legislative statement in the preamble to N.J.S.A.

§ 2C:25-18 [the Prevention of Domestic Violence Act] as justification for" its decision to toll the

statute of limitations in cases where the plaintiff can establish by medical, psychiatric, or psychological evidence, that she suffers from BWS.  <u>Giovine</u>, 284 N.J. Super. at 18.  The preamble to that statute provides, in relevant part:

> The Legislature finds and declares that domestic violence is a serious crime against society; that there are thousands of persons in this State who are regularly beaten, tortured and in some cases even killed by their spouses and cohabitants . . . .  It is therefore, the intent of the Legislature to assure the victims of domestic violence the maximum protection from abuse the law can provide.

N.J.S.A. § 2C:25-18.  In so holding, the Appellate Division was guided by the New Jersey Supreme Court's previous declaration on how to apply limitations periods: a "just accommodation of individual justice and public policy requires that in each case the equitable claims of opposing parties must be identified, evaluated and weighed.  Whenever dismissal would not further the Legislature's objectives in prescribing the limitation, the plaintiff should be given an opportunity to assert the claim."  <u>Galligan</u>, 82 N.J. at 193 (internal citations and quotations omitted).

Where the New Jersey legislature has taken the position that victims of domestic violence be assured the maximum protection from abuse that the law can provide, N.J.S.A. § 2C:25-18, it is a logical conclusion that New Jersey has the greatest governmental interest in seeing its statute of limitations applied here, where domestic abuse is alleged and those allegations permeate the plaintiff's theory of the case.

Gresham argues that the New York statute of limitations should be applied because New York has the highest quality of contacts with the parties.  The Court disagrees.  Of the 19 specific instances of physical violence listed in Theresa's answers to interrogatories, five of the acts occurred in New Jersey, five occurred in New York, five occurred in Pennsylvania, and one occurred in each of California, Utah, Aruba, and Anguilla.  This demonstrates that the quality of contacts between the

three different states is nearly indistinguishable.  While Theresa has lived in New York for the past

10 years and has also held jobs in New York, she has also lived and worked in New Jersey and

Pennsylvania.  A longer residency and employment history in New York is not enough to outweigh

New Jersey's strong interest in protecting victims of domestic violence.

### C.  Negligent Infliction of Emotional Distress Claim

The same conflict of laws that exists for the intentional tort claims also exists for Theresa's

claim of negligent infliction of emotional distress.  New Jersey and Pennsylvania each have a two-

year statute of limitations for negligent infliction of emotional distress claims, N.J.S.A. § 2A:14-2(a);

42 Pa. Con. Stat. § 5524(2), while New York has a one-year statute of limitations, N.Y. C.P.L.R.

215(3); Goldstein v. Mass Mut. Life Ins. Co., 820 N.Y.S.2d 852, 854 (Sup. Ct. 2006) (stating that

negligent infliction of emotional distress claims that allege intentional conduct, as opposed to those

that allege purely negligent conduct, are governed by the one-year statute of limitations for

intentional torts).

For the same reasons that the Court concluded that New Jersey's statute of limitations

governs Theresa's intentional tort claims, the Court concludes that New Jersey's two-year statute of

limitations applies to Theresa's claim for negligent infliction of emotional distress.

### V.      ANALYSIS

### A.  Contract Claims

Prior to 1976, courts refused to enforce support agreements between unmarried individuals

living in a marital-like relationship.  However, the Supreme Court of California greatly expanded

the rights of unmarried partners when it declared such contracts enforceable in Marvin v. Marvin,

557 P.2d 106 (Cal. 1976).  The Marvin Court declared:

>The fact that a man and woman live together without marriage, and engage in a sexual relationship, does not in itself invalidate agreements between them relating to their earnings, property, or expenses. Neither is such an agreement invalid merely because the parties may have contemplated the creation or continuation of a nonmarital relationship when they entered into it. Agreements between nonmarital partners fail only to the extent that they rest upon a consideration of meretricious sexual services. Thus the rule asserted by defendant, that a contract fails if it is 'involved in' or made 'in contemplation' of a nonmarital relationship, cannot be reconciled with the decisions.

Id. at 113. New Jersey adopted the Marvin Court's reasoning several years later in Kozlowski v. Kozlowski, 80 N.J. 378 (1979). In so holding, the unanimous court noted that its decision "[did] no more than recognize that society's mores have changed . . . ." Id. at 387.

Three years after deciding Kozlowski, the New Jersey Supreme Court was asked to decide whether temporary relief can be awarded in a palimony suit. Crowe v. De Gioia, 90 N.J. 126 (1982). The court answered with an emphatic yes. Id. at 129.

>To achieve substantial justice in other cases, we have adjusted the rights and duties of parties in light of the realities of their relationship. . . . Our endeavor is to shape a remedy that will protect the legally cognizable interests of the parties and serve the needs of justice.
>    . . . .
>    . . . Equity preserves that flexibility to devise new remedies to meet the requirements of every case, and to satisfy the needs of a progressive social condition, in which new primary rights and duties are constantly arising, and new kinds of wrongs are constantly committed.

Id. at 135-37.

The New Jersey Supreme Court further clarified the law of palimony when it declared in In re Estate of Roccamonte, 174 N.J. 381 (2002), that such contracts are enforceable against the estate of the promisor. Judge Pressler, writing for the New Jersey Supreme Court, noted that the law of palimony "accepts" enforcement of a promise between unmarried persons of lifetime support based on the quality of their relationship as "marital-type," and then defined what a "marital-type"

-17-

relationship is:

> The principle we recognized and accepted is that the formation of a marital-type relationship between unmarried persons may, legitimately and enforceably, rest upon a promise by one to support the other. A marital-type relationship is no more exclusively dependent upon one partner's providing maid service than it is upon sexual accommodation. It is, rather, the undertaking of a way of life in which two people commit to each other, foregoing other liaisons and opportunities, doing for each other whatever each is capable of doing, providing companionship, and fulfilling each other's needs, financial, emotional, physical, and social, as best as they are able. And each couple defines its way of life and each partner's expected contribution to it in its own way. Whatever other consideration may be involved, the entry into such a relationship and then conducting oneself in accordance with its unique character is consideration in full measure.

Roccamonte, 174 N.J. at 392-93.

In 2006 the New Jersey Appellate Division moved toward the position that cohabitation is a predicate requirement for bringing a palimony action, and the cases decided in this vein form the basis of Gresham's motion on the contract claims. This movement began with Levine v. Konvitz, 383 N. J. Super. 1 (App. Div. 2006), where the court was reviewing a decision in favor of the estate of the alleged promisor against the claims of a woman with whom he had had a long relationship. Reviewing the New Jersey Supreme Court cases on palimony, the court concluded that Judge Pressler's view of a marital-type relationship impliedly and indispensably included cohabitation. Id. at 10. Because the trial judge had denied palimony on grounds that the claimant and the decedent had not lived together, the appellate court set out

> to examine one aspect of the so-called "marital-type" relationship, "cohabitation," as a step in the analysis of determining the enforceability of a promise of support. We are confident that reasonable minds can and do in fact differ on the definition of a "marital-type" relationship. We are equally confident that cohabitation was an implied and indispensable part of Judge Pressler's poetic description of the term.

Id.

-18-

Levine set forth three reasons why a cohabitation requirement exists and why it must be bright-line.  Id.  First, the court found that without a requirement of cohabitation, "the concept of 'marital-type' relationship is unacceptably vulnerable to duplicitous manipulation."  Id.  Then,

> cohabitation requires the demonstrable act of setting up a household together.  Thus, *in contrast to an extramarital affair, even a long-term one, cohabitation announces to the ones most affected by the existence of the relationship, the innocent spouse and dependent children*, that defendant has entered into a relationship that may result in significant and long-term impairment of family assets.

Id. at 10-11 (emphasis added).  Evidently, this justification assumes that at least one of the parties to the relationship is (if still alive), or was (if deceased when the matter is being litigated), married to someone else during the extra-marital relationship and had children with that third party.  And finally, Levine found that "cohabitation is the physical manifestation of what Judge Pressler described in Roccamonte as 'the undertaking of a way of life in which two people commit to each other, foregoing other liaisons and opportunities.'"  Id. at 11.  The third justification rests, apparently, on the same theory as the second: how to weigh the claims – which would have a demonstrable "physical manifestation" if the parties had cohabited – against the entitlements of a third party or parties.  The requirement has questionable application without a showing of other liaisons and opportunities.

McDonald v. Mavety, 383 N. J. Super. 347 (App. Div. 2006), is the next decision Gresham relies on.  There the appellate court cited to Levine in responding to plaintiff's argument on appeal that the trial judge took too narrow a view of the standards governing palimony, and ruled that "a critical element of a palimony claim is cohabitation for a significant period of time."  383 N. J. Super. at 360.  Aside from the embellishment of a time requirement, Mavety did not examine in depth the Levine reasoning; but in the same way as Levine, the court was sorting out the rights of

the claimant against those made by family members of the deceased alleged promisor.  In re Estate of Sasson, 387 N.J. Super 459 (App. Div. 2006), followed several months after Mavety, and involved not whether the couple cohabited, but whether a cohabitation period of two and one-half years qualified as "cohabitation for a significant period of time."  The court upheld the trial court's finding that the time period was too short.  Id. at 469.

Citing these holdings, on March 6, 2007 the Appellate Division decided Crayne v. Marchese, 2007 WL 655446, *5, and held:

> The arguments made by plaintiffs here are no different than those recently advanced and rejected by our colleagues.  We are satisfied that this court's recent analyses of the trilogy of Supreme Court palimony cases is sound.  We thus perceive no reason to disagree with their conclusions that cohabitation for a significant period of time is an implicit component of a marital-like relationship necessary for a palimony action, and that cohabitation requires living together under the same roof on a regular basis.

The state of the law in New Jersey, then, is that the intermediate court has decided that in a palimony case, a plaintiff must show she has lived with the alleged promisor under the same roof on a regular basis for a significant period of time.  The reason advanced is that such living arrangements constitute an implied and indispensable element of a "marital-type" relationship as defined by the New Jersey Supreme Court.  Important for this Court to note, this analysis is not derived from explicit statements of the highest state court, but from an interpretation of what the New Jersey Supreme Court's definition of a "marital-type" relationship means.  Also important for this Court to recognize in deciding how the State supreme court would rule on the issue, is the basis for this newly articulated bright-line requirement: eliminating the danger of "duplicitous manipulation," protecting the interests of innocent spouses and children, and providing a physical manifestation of the nature of the relationship.

-20-

Significantly, these three justifications have greatest application – and in the case of the second and even the third, their only relevance – when the alleged promisor is deceased or close to death, the promisor's estate or legal representative is disputing the promise was made, and the only witness to the "marital-type" quality of the relationship is the claimant, a fact situation behind all of the opinions adopting the bright-line test.

But what happens when both parties to the relationship are alive, and the bright-line test is sought by a litigant who is alive and capable of offering his own proofs about the character of the relationship with the claimant?  And what happens when insisting on a bright-line test does not comport with the reasons why palimony has become a recognized and enforceable claim?  Is there a form of immunity created by the bright-line requirement that bites the hand of equity?

Here, the record supports Theresa's allegations that the parties formed a long-lived relationship that was completely exclusive on her part and just about exclusive on his, and that Gresham made promises of financial support and provided considerable and regular support throughout.  She has provided written documents signed by Gresham indicating his desire to support her.  Her father has also testified that Gresham repeated his promises to support Theresa in front of him and his wife.  It is, moreover, undisputed that all but one of her financially formative years were spent in the relationship and that throughout those years, Gresham was supporting her.  An easily drawn inference from the record is that this plaintiff was foregoing other romantic and professional opportunities.  She was his regular companion on lengthy trips where being part of a couple had value to him but did not necessarily foster her value in the marketplace.  As such, a reasonable factfinder could conclude that the relationship drew her into the vector of profound dependency that her attorney argues is the signal feature of this relationship.  A reasonable factfinder could also

conclude that Gresham's inability to remember simple details of the parties' relationship, such as how much time the parties spent together over the years, is a deliberate attempt to downplay the significance of their relationship.

Taking as it must plaintiff's allegations and evidence in the best light, this Court concludes that Theresa has provided evidence of a relationship with Gresham that satisfies the definition of a "marital-type relationship" set down by New Jersey's highest court, to wit:

> the undertaking of a way of life in which two people commit to each other, foregoing other liaisons and opportunities, doing for each other whatever each is capable of doing, providing companionship, and fulfilling each other's needs, financial, emotional, physical, and social, as best as they are able. *And each couple defines its way of life and each partner's expected contribution to it in its own way.*

Id. at 392-93.  Reading Levine, Mavety, Sasson, and Crayne, that last point still survives – Crayne, the latest, acknowledges that "every arrangement between every couple is fact-sensitive and indeed 'intensely personal.'"  Crayne,  2007 WL 655446, *5.  And this fact-sensitivity is the hallmark of all the cases preceding Levine.  As well it should and must be, because the palimony cause of action arose out of equitable concerns, and has been deemed to belong in Chancery Division, Family Part where a fact-sensitive approach is the fundamental task for each decision-maker.  Without a ruling from the highest court of New Jersey that the plaintiff must prove that the parties lived together under the same roof for a significant period of time as a prerequisite to a palimony claim, this Court believes that it must construe Theresa's claims for future support based on the parties' relationship in all of its individuality and complexity.

This is particularly true where, as here, *both* parties are alive and able to define their way of life as a couple and each one's contribution to that way of life.  Theresa is not suing Gresham's estate and there is no suggestion that he is infirm or unable to respond to her allegations – both parties have

already given full depositions and produced and explained documents.  At a bench trial both can testify and cross-examination, "the greatest legal engine ever invented for the discovery of truth," <u>California v. Green</u>, 399 U.S. 149, 158 (1970) (quoting 5 J. Wigmore, Evidence § 1367 (3d ed. 1940)), can ferret out "duplicitous manipulation," the only applicable justification for the bright-line requirement Gresham argues for.

For these reasons, the Court is satisfied that under facts such as these, the New Jersey Supreme Court would rule that cohabitation is an important, *but not an indispensable*, factor that must be considered in determining whether a marital-type relationship was formed for purposes of establishing a palimony claim.  A careful review of <u>Kozlowski</u>, <u>Crowe</u>, and <u>Roccamonte</u>, reveals that the elements of a palimony claim are: (1) the parties formed a marital-type relationship; and (2) during the course of this marital-type relationship, the defendant promised to support the plaintiff. The <u>Roccamonte</u> court explicitly declared that "the principle we recognized and accepted [in <u>Kozlowski</u> and <u>Crowe</u>] is that the formation of a marital-type relationship between unmarried persons may, legitimately and enforceably, rest upon a promise by one to support the other." <u>Roccamonte</u>, 174 N.J. at 392.  Significantly, the New Jersey Supreme Court then defined what a "marital-type relationship" is without mentioning cohabitation.  <u>Id.</u> at 392-93.

While a bright-line rule is certainly convenient, it has the potential of thwarting the Court's duty to "protect the legally cognizable interests of the parties and serve the needs of justice." <u>Crowe</u>, 90 N.J. at 135.  Rigid application of such a rule to these facts would take away the Court's "flexibility to devise new remedies to meet the requirements of every case." <u>Id.</u> at 137.  Applied here, the bright-line rule requires the Court to ignore the financial dependency of this claimant, whose working years were spent in a relationship with a much older, richer, experienced, and

-23-

worldly man who initiated the relationship with her while she was a college sophomore and he was fully aware that her father worked for his company.[1]   A rigid rule of cohabitation would shield Gresham, single and unencumbered, from any exposure to Theresa's financial claims because he chose neither to move into Theresa's residences that he paid for and/or pursued the relationship in, nor to invite her to move in with him.  The New Jersey Supreme Court's jurisprudence, it has stated, is intended "to satisfy the needs of a progressive social condition, in which new primary rights and duties are constantly arising, and new kinds of wrongs are constantly committed." Crowe 90 N.J. at 137.  A bright-line rule of cohabitation would not further this goal.

Because the record establishes the elements for a palimony claim as defined by New Jersey's highest court, consisting of a marital-type relationship and a promise to support, and because this Court concludes that cohabitation by these parties is not required to advance the concerns of the intermediate court decisions relied on by Gresham, his motion for summary judgment is denied on the contract claims.  Counts 3, 4, 5, 8, and 9 may proceed to trial.

## B.  Intentional Tort Claims

Gresham argues that Theresa's claims for assault, battery, and intentional infliction of emotional distress must be dismissed because the claims are governed by New York's one-year statute of limitations and the complaint was filed one year and one day after the last alleged tort was committed.  Also citing to New York law, Gresham further argues that the expert report submitted

---

[1] It is arguable under New Jersey law if Theresa was emancipated at the time the parties began their relationship.  Dolce v. Dolce, 383 N.J. Super. 11, 17-18 (App. Div. 2006) (noting about an 18-year-old that emancipation "is not a self-executing principle" and that "[t]he essential inquiry is whether the child has moved beyond the sphere of influence and responsibility exercised by a parent and obtains an independent status of her own").  Indeed, the complaint describes Theresa at the outset of the relationship as "young and frightened, and susceptible to undue influence by a prominent, wealthy man 37 years her senior who controlled her father's employment."  (Compl. at ¶ 10.)

by Theresa that concludes that she is suffering from BWS is irrelevant because a New York court has never tolled the statute of limitations based on BWS.

The Court found above that the two-year New Jersey statute of limitations applies to Theresa's intentional tort claims.  Because it is undisputed that at least some of the alleged intentional torts occurred within the two-year statute of limitations and because it is undisputed that New Jersey recognizes that BWS has some effect on the statute of limitations, Gresham's motion for summary judgment is denied as to the intentional tort claims.  The Court will make a determination on the effect of BWS on the allegations of intentionally tortious conduct that are outside the two-year statute of limitations after considering the evidence presented at trial.

## C.  Negligent Infliction of Emotional Distress Claim

Gresham argues that he is entitled to summary judgment on Theresa's claim for negligent infliction of emotional distress because it is barred by New York's one-year statute of limitations, is not supported by medical evidence as required by New York law, and is based on intentional torts and therefore subsumed under the intentional tort claims.

The Court found above that this claim is governed by New Jersey law.  New Jersey provides for a two-year statute of limitations for negligent infliction of emotional distress claims and at least one of the complained of incidents occurred within this two-year period.  Moreover, Gresham has not cited and the Court has not found any New Jersey case holding that medical evidence is required to sustain a claim for negligent infliction of emotional distress.  Finally, while the Court acknowledges that there appears to be significant overlap between Theresa's intentional tort claims and her claim for negligent infliction of emotional distress, the defense is not prejudiced if the latter is preserved, and the Court deems dismissal before a trial on the merits is premature.

## VI.   CONCLUSION

For the foregoing reasons, Gresham O'Malley's motion for summary judgment is denied.


Dated: March 28, 2007                              /s/ Katharine S. Hayden
_____Katharine S. Hayden, U.S.D.J.